## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

ADAM JARCHOW and MICHAEL D. DEAN

      Plaintiffs,

  v.

STATE BAR OF WISCONSIN, *et al.*,

      Defendants.

Civil Case No. 3:19-cv-00266

## **Plaintiffs' Response to Defendants' Motion to Dismiss**

## INTRODUCTION

In *Janus v. AFSCME, Council 31*, the Supreme Court held that "the compelled subsidization of private speech seriously impinges on First Amendment rights, [and] it cannot be casually allowed." 138 S. Ct. 2448, 2464 (2018). Accordingly, *Janus* struck down an "agency fee" arrangement that forced public employees to fund union speech during and related to collective bargaining as a condition of their continued employment. The decision made clear that only individuals who affirmatively "opt in" to such arrangements may be charged for union speech—including collective-bargaining speech that (supposedly) benefits all employees in a unit.

This case challenges a forced-speech arrangement no different from the one *Janus* condemned—except that it is an even plainer affront to the First Amendment. Defendants, the State Bar of Wisconsin and its officers, under color of Wisconsin law, engage in speech on matters of public concern, and they fund that speech with fees extracted from bar members, who not only are required to fund the Bar's speech but also to join it as card-carrying members as a condition of practicing law in Wisconsin. Thus, like the union agency-fee arrangement *Janus* invalidated, this "integrated bar" arrangement forces Wisconsin attorneys to fund the Bar's speech as a condition to earning a livelihood. And, worse than the unlawful agency-fee arrangement in *Janus*, Wisconsin requires all lawyers to formally and expressly associate with the Bar *as members of the organization*. Even the principal dissenting *Janus* opinion assumed this kind of forced-membership arrangement to be unconstitutional.

Wisconsin's compelled-subsidization arrangement cannot pass scrutiny under the First Amendment principles *Janus* set down. Courts have for years recognized that there is no material First Amendment difference between labor unions and integrated or unified bar associations. Thus, under *Janus*, Wisconsin's integrated-bar arrangement is subject to heightened scrutiny. And it cannot be defended on the ground that bar dues are tailored to prevent "free ridership" because *Janus* rejected that as a compelling government interest: *all* organizations can claim to benefit a broader class of persons than those who support them financially,

and so the logic contains no limiting principle. That leaves only the argument that forced fees and membership are essential to furthering the Bar's function of regulating attorneys. But to regulate lawyers, the Bar does not need to take the stances of opposing capital punishment, shielding suspected sex offenders, restoring felon voting rights, or condemning the President's political speech, nor does it need to provide commentary on gun rights and regulation or immigration policies. There is a plainly less-restrictive means to this end: Wisconsin could license attorneys without requiring them to join an expressive organization and subsidize its advocacy. Just as Wisconsin plainly cannot compel its citizens' membership in the Republican Party, the ACLU, or the NAACP, it cannot compel them to join and fund an entity that spends its members' dues on advocacy—which is what the Wisconsin Bar does. Thus, Plaintiffs are entitled to relief.

Nevertheless, this Court is precluded from providing Plaintiff's requested relief because the Supreme Court, nearly three decades ago, applied the principles *Janus* directly rejected—and the case law *Janus* expressly overruled—to uphold California's integrated-bar arrangement. *Keller v. State Bar of California*, 496 U.S. 1 (1990). And, previously, it upheld compelled bar membership. *See Lathrop v. Donohue*, 367 U.S. 820, 842–43 (1961). Plaintiffs thus do not oppose Defendants' motion to dismiss their claims as foreclosed under these precedents. Yet for the reasons that follow, Plaintiffs are confident that when the Supreme Court revisits this error it will conclude that broader First Amendment principles control this case, not the arbitrary exceptions to those principles that *Janus* rejected. Thus, the Court can best afford Plaintiffs an opportunity for prompt relief by deciding Defendants' motion to dismiss without argument and thereby enabling Plaintiffs to pursue relief in a forum with the authority to align the law in this area with the principles articulated in *Janus*. To preserve their arguments for appeal, Plaintiffs explain in this memorandum of law why the First Amendment entitles them to relief.

# BACKGROUND

### A. Wisconsin Law Requires Attorneys Licensed in Wisconsin To Join the Mandatory State Bar and Pay Annual Membership Dues

The State Bar of Wisconsin ("State Bar") is a mandatory professional "association" as specified by Wisconsin Supreme Court's rules. Wis. Sup. Ct. R. ("SCR") 10.01(1). It enforces the "rights, obligations and conditions of membership therein," SCR 10.01(2), and may be sued for "carrying out the purposes for which it is organized," SCR 10.02(1). The "affairs of the [State Bar]" are "managed and directed by a board of governors," which consists of the State Bar's six officers and past State Bar presidents, along with members elected from local districts and the Bar's various divisions, and three Wisconsin Supreme Court appointed nonlawyers. SCR 10.05(1); *see also* SCR 10.02(2) (State Bar's mission statement). The State Bar's website asserts it is a "professional association that provides educational, career development and other services to its 25,000 members." ECF No. 1, Complaint ¶ 18.

The State Bar of Wisconsin is an integrated or unified bar, meaning it requires membership and membership dues as a condition of practicing law in the State. Specifically, the Wisconsin Supreme Court rules direct: "There shall be an association to be known as the 'state bar of Wisconsin' composed of persons licensed to practice law in this state, and membership in the association shall be a condition precedent to the right to practice law in Wisconsin." SCR 10.01(1). Wisconsin requires "[e]very person who becomes licensed to practice law in [the] state" to "enroll in the state bar by registering…with the [State Bar] within 10 days after admission to practice." SCR 10.03(2). These same rules forbid an "individual other than an enrolled active member of the state bar" to "practice law in [the] state or in any manner purported to be authorized or qualified to practice law," SCR 10.03(4), with limited exceptions for "nonresident counsel to appear and participate in a particular action or proceeding in association with an active member of the state bar of Wisconsin." SCR 10.03(4)(b). The State Bar has four membership classes: "active members, judicial members, inactive members and emeritus members." SCR 10.03(a).

The State Bar is permitted to compel payment of dues from all classes of Wisconsin State Bar members, SCR 10.03(5)(a) ("The annual membership dues for state bar operations for an active member shall be established as provided herein."); *id.* (establishing "fractions of the dues of an active member" for "[o]ther classes of members."), except for its emeritus members (members who are active or inactive members in good standing but at least 70 years of age and have requested emeritus status), SCR 10.03(3)(a). The State Bar does compel the payment of such membership dues—termed "compulsory dues" by the State Bar. Compl. ¶ 20. The annual membership dues vary based on membership classification: $258 for full dues-paying members; $129 for active new members and inactive members; $173 for non-voting judicial members; and no cost to emeritus members. *Id.* The State Bar's "2019 budget of $11.5 million will be funded with $5.2 million in membership dues." Compl. ¶ 23. And in 2020, the proposed budget relies on membership dues for about 45 percent of the funding. *Id.*

If a member fails to pay annual dues or assessments for over 120 days after the payment deadline, the State Bar will automatically suspend the attorney's membership. SCR ch. 10 app., art. I, § 3(a)–(b). This prohibits the member from "practice[ing] law during the period of the suspension." SCR 10.03(6). A suspended member's name is sent to the Wisconsin Supreme Court and to "each judge of a court of record in [the] state," ensuring the member will not be able to practice law in the state. SCR ch. 10 app., art. I, § 3(a)–(b).

**B.     The State Bar Uses Members' Dues to Speak on Matters of Public Interest**

The State Bar speaks on a broad range of matters subject to intense public interest. These matters of public interest include the death penalty, gender identity, gun rights and regulation, criminal justice initiatives, policies towards suspected sex offenders, President Trump's tweets, immigration policies, and public education—all core protected speech that "occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Janus*, 138 S. Ct. at 2476 (citations omitted). It also speaks on matters concerning the practice of law and regulation of the practice of law, both matters of public interest. Compl. ¶ 38 (a). The State Bar uses membership dues to produce many publications,

including the Wisconsin Lawyer, the WisBar Inside Track, the Rotunda Report, the State Bar of Wisconsin website, the State Bar's Twitter feed, the State Bar's Facebook page, and books and pamphlets. Compl. ¶ 35. Through these mediums of communication, the State Bar speaks on many issues of intense public interest.

For example, the State Bar speaks on criminal justice issues. On its website, the Bar has posted that the organization officially opposes the death penalty. Compl. ¶ 38 (a)(xii). It has voiced its opposition to a bill in the legislature that would require law enforcement to collect DNA specimen from certain arrestees. *See* Compl. ¶ 38 (p). It has voiced its support for releasing certain "older inmates" from prison. Compl. ¶ 38 (f). The Bar has also advocated for restoring felon's voting rights. Compl. ¶ 38 (n). And it has also joined the public policy debate on "disparate and mass incarceration." Compl. ¶ 38 (f).

The State Bar has also used its public platform to criticize President Trump. The Bar admonished President Trump for his tweet characterizing the judge that suspended an executive order as a "so-called judge" by adopting a statement labeling the President's tweets as "ill-considered." Compl. ¶ 38 (j). The State Bar also published an article ostensibly on considerations for employers related to President Trump's executive order concerning national security and immigration but then shifted tone with a sub-heading, "Why the Executive Order Is Immoral and Unconstitutional," with the author characterizing the executive order as "obnoxious" and "unjust." Compl. ¶ 38 (i).

The State Bar has provided extensive commentary on the Second Amendment and gun rights, including tweeting an article on potential online gun sales liability that included offering one view that overturning a decision that online gun sellers may be liable for negligence in certain transactions would result in "domestic abusers…continu[ing] to have easy — and deadly — access to firearms." Compl. ¶ 38 (b). Similarly, the State Bar has tweeted an article sharing the view the Court's inaction on Second Amendment cases "has led some to assume that the Roberts court has become a silent but influential partner on the side of gun-control advocates, taking action by deciding not to act." Compl. ¶ 38 (c).

The State Bar used its platform to promote support for "diversity," which it defines as "an inclusive concept that encompasses, among other things, race, ethnicity, national origin, religion, gender, gender identity, age, sexual orientation and disability." Compl. ¶ 38 (a)(vii). The State Bar followed through on its policy in 2018 by adopting a detailed action plan to advance diversity and inclusion within the legal profession—one of the State Bar's five strategic priorities—to include preference in recruiting "diverse attorneys for leadership positions within the State Bar." Compl. ¶ 38 (e).

These are examples of speech on some of the most controversial matters of intense public interest that members are compelled to fund with their membership dues. The State Bar, however, uses membership dues to fund speech on many other issues of public interest as well. *See* Compl. ¶ 37 (a)–(c) (advocacy on criminal justice issues and juvenile justice reform); Compl. ¶ 37 (d) (advocacy to increase private bar rate in criminal justice budget); Compl. ¶ 37 (e) (advocacy on abortion coverage); Compl. ¶ 37 (f) (advocacy for criminalizing threats or harm to attorneys); Compl. ¶ 37 (g) (advocacy for elder law reform); Compl. ¶ 37 (h) (advocacy for family law legislation addressing child relocation); Compl. ¶ 37 (i) (advocacy for restoring legal services corporation (LSC) funding); Compl. ¶ 37 (k) (advocacy related to unemployment insurance fraud); Compl. ¶ 37 (l) (advocacy against amending child custody presumptions); Compl. ¶ 37 (m) (advocacy against confidentiality exception for school officials); Compl. ¶ 37 (o) (advocacy to eliminate spiritual exception to child abuse law); Compl. ¶ 37 (q) (advocacy for legal services consumer protection act). And, of course, it speaks regarding the practice of law and the regulation of the practice of law. Compl. ¶ 38 (a). In short, the State Bar is a prolific participant in the public policy debates on many issues—all on matters of intense public interest. And this speech is funded, in whole or in part, with compulsory membership dues.

The State Bar also maintains a dedicated lobbying effort, which is also supported with compulsory membership dues. The State Bar's Government Relations is the "lobbying arm of the State Bar and some of its practice sections." Compl. ¶ 26. This arm of the State Bar

"works with State Bar members and state government officials (including legislators, executive branch and judicial branch agencies and their staff) to improve the administration of justice and the delivery of legal services in Wisconsin." *Id*. The State Bar has identified the following practice sections within the State Bar as permitted to lobby: Bankruptcy, Insolvency & Creditors' Rights; Business Law; Children & the Law; Civil Rights & Liberties; Construction & Public Contract Law; Criminal Law; Dispute Resolution; Elder Law and Special Needs; Family Law; Health Law; Indian Law; Litigation; Public Interest Law; Real Property, Probate & Trust Law; and Taxation Law. Sections, State Bar of Wisconsin. Compl. ¶ 27. A lobbying section must "charge[] annual dues at least equal to the cost of its legislative program so that the cost need not be borne by section nonmembers." SCR 10.05(4)(e).

To be sure, the State Bar represents that its advocacy is permissible under the Supreme Court's decision in *Keller v. State Bar of California*, 496 U.S. 1 (1990), which held that integrated or unified state bars may not charge non-consenting attorneys for "ideological" speech. *See* Compl. ¶ 43 (discussing the State Bar's *Keller* rebate policy). To that end, the State Bar provides a limited mechanism by which members may object to the use of their membership funds to promote speech of public concern.

The State Bar provides an optional dues reduction for "nonchargeable" activities. It is incumbent on the State Bar to "publish written notice of the activities that can be supported by compulsory dues and the activities that cannot be supported by compulsory dues." SCR 10.03(5)(b)(2). The nonchargeable activities include a combination of political and ideological activities and activities not germane to regulation of the legal profession or improving legal services. The State Bar then requires members to opt-out of financing nonchargeable activities. Compl. ¶ 43. The State Bar informs members it "may use compulsory dues of all members for all other activities, provided the activities are within the purposes of the State Bar as set forth in SCR 10.02(2)." Compl. ¶ 24. These activities are considered "chargeable." *Id*.

The State Bar announced an ostensibly broader nonchargeable rebate policy in 2018 that would include "*all* direct lobbying," which would include all lobbying activity that it

deems germane to regulating the legal profession and improving the quality of legal services. Compl. ¶ 43. As part of its *Keller* opt-out policy, the Bar concluded that expenditures deemed non-chargeable to mandatory dues will include expenditures that relate to activities that constitute direct lobbying on policy matters before the state and federal legislatures. But the Bar's policy is still narrowly confined to certain expenditures and does not address the myriad of expenses the State Bar incurs enterprise-wide that facilitates its lobbying and messaging. The opt-out reduction does not reduce dues altogether. *See* SCR 10.03(5)(b)(2) (providing a member may withhold *only* the portion of dues that "cannot be supported by compulsory dues"). It provides some members with only a *partial reduction* from incurring the cost of activities the Bar deems to be "nonchargeable."

Beyond withholding a full share of an active member's noncharageable refund, the State Bar has opted for a "rob Peter to pay Paul" approach in addressing the ever-increasing losses incurred by its *Keller* rebates.[1] For example, the State Bar will use its "Dues Stabilization Reserve" in FY20 to off-set the loss of $30,000 in *Keller* reductions due to two one-time events in FY18.[2] The Bar uses this rearrangement of monies to essentially gut the *Keller* opt-out of any effect on the budget. In discussing how to off-set the *Keller* increase in the FY19 budget, the State Bar's Chief Financial Officer commented, "A charge was given to staff to attempt doing so without a need to *further* earmark reserve funds." Mem., FY19 Proposed Budget—FINAL DRAFT ("FY19 Budget") at 1, from Mr. Marshall to State Bar of Wisconsin (Apr. 20, 2018) (emphasis added).

---

[1] The State Bar estimates its *Keller* reduction in FY20 will be $65,000 more than incurred in FY18 and $41,000 more than budgeted in FY19. Mem., FY20 Proposed Budget—DRAFT ("FY20 Budget") at 5, from Mr. Marshall to State Bar of Wisconsin (January 30, 2019).
[2] The State Bar calculates its *Keller* reductions for the current year based on financials from two years prior. *See Notice Concerning State Bar Dues Reduction and Arbitration Process*, State Bar of Wisconsin § 1 (2016); *see also State Bar Board Acts on OLR Petitions, Approves Budget, Takes Other Actions*, Apr. 12, 2019, State Bar of Wisconsin, https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=26946.

### C.  Plaintiffs Disagree with the State Bar's Speech and Object to Being Associated with It as Members

Plaintiffs are attorneys licensed to practice law in Wisconsin. To maintain their licensure, which is a condition of engaging in their chosen profession, Plaintiffs are compelled to be members of the State Bar and pay membership dues every year. Compl. ¶ 41. Plaintiffs disagree with the State Bar's speech and oppose being compelled to financially support it with their membership dues. Compl. ¶ 46. Plaintiffs further object to being compelled to be members of the State Bar. Compl. ¶¶ 47–51.

Plaintiffs disagree with the State Bar's advocacy and other speech on the following issues, among others: criminal justice issues, Legal Services Corporation Funding, felon voting rights, maintaining an integrated bar, the unauthorized practice of law, professional taxes, tax reform, immigration law, public campaign financing, the death penalty, unemployment insurance fraud, free exercise of religion, and immigration law. Compl. ¶¶ 47–51.

### LEGAL STANDARD

A district court should grant a motion to dismiss when the complaint fails to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### ARGUMENT

The First Amendment protects the individual rights to free speech and free association. Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Freedom of association …plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). Accordingly, the constitutional rights to free speech and free association "may prevent the government from…compelling certain individuals to pay subsidies for speech to which they object." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *see also Knox v. Serv. Emps.*

*Int'l Union, Local 1000*, 567 U.S. 298, 310–11 (2012) ("[C]ompulsory fees constitute a form of compelled speech and association that imposes a significant impingement on First Amendment rights."). "Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

Defendants, acting under color of Wisconsin law, have compelled Plaintiffs to enter into an expressive association—no different from joining a political party, church, fraternal organization, political-action committee, or advocacy group—and to fund speech on matters of intense public concern through their membership dues as a condition to practicing law in Wisconsin. That plainly violates the First Amendment. Indeed, the Supreme Court has expressed the hope that no one "would seriously argue that the First Amendment permits" a state to "require[] all residents to sign a document expressing support for a particular set of positions on controversial public issues." *Janus*, 138 S. Ct. at 2464. Yet that is the premise of Wisconsin's scheme requiring bar dues and membership as a condition to practicing law: that Wisconsin lawyers can be forced to fund and be identified with unwanted speech and expressive association. In sum, being an attorney in Wisconsin means state-compelled bar membership and support for its views, which is a clear violation of the First Amendment.

To be sure, this Court is bound to follow *Keller* at this time because the Supreme Court has not yet aligned its jurisprudence in this area with the clear principles stated in *Janus* and its other speech cases. In particular, the Supreme Court's decision in *Keller* relies on precedent that *Janus* overruled to uphold mandatory bar dues from First Amendment challenge. Because *Keller* has not yet been overruled, it is binding on this Court. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Accordingly, the most expedient way for this Court to permit Plaintiffs' claims to proceed so that they can vindicate their rights is to decide Defendants' motion to dismiss

without argument and enter findings of fact and conclusions of law to facilitate further review from a forum with the ability to consider Plaintiffs' challenge to *Keller*. Plaintiffs submit this Memorandum to make a record of the bases for their claims, to preserve their arguments for appeal, and to briefly explain why *Keller* and *Lathrop* should be overruled and why the Supreme Court's broader First Amendment jurisprudence, including *Janus*, should control.

## I. Wisconsin's Integrated Bar Violates Plaintiffs' First Amendment Rights

Plaintiffs are entitled to relief under the broader First Amendment principles articulated in *Janus* because compelling them to join as card-carrying members and forcing them to fund the State Bar's speech as a condition of practicing law in Wisconsin burdens their First Amendment rights without surviving any potentially applicable standard of constitutional scrutiny. *Keller*, which relied on *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 236 (1977), is inconsistent with *Janus* and out of sync with broader First Amendment principles. The same is true of *Lathrop*. They should be overruled.

### A. Requiring Plaintiffs to Join and Fund the State Bar Violates Their Speech and Association Rights

Wisconsin's integrated bar violates the First Amendment in two separate ways. First, attorneys in Wisconsin are unable to practice law without funding the State Bar's speech and joining into an expressive association with it—the very constitutional injury condemned in *Janus*. Second, attorneys licensed in Wisconsin are compelled to join the State Bar as full-fledged members to practice law, and that requirement would not survive even under a pre-*Janus* precedent, which recognized that such an association violates First Amendment rights. Thus, Wisconsin's integrated bar violates the First Amendment.

#### 1. Compelled Dues Payments Violate the First Amendment

The Supreme Court has expressly recognized that the First Amendment prohibits "compelled subsid[ies]," whereby "an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). The most recent application of that rule was the Supreme Court's

*Janus* decision, which struck down required "agency fees," exactions of dues from public employees for remittance to labor unions. *See* 138 S. Ct. at 2478. Wisconsin's integrated-bar scheme is no different from the agency-fee regime *Janus* condemned. Defendants' contentions (at 8–9) that the Bar is constitutional under *Keller* fails to distinguish *Keller* from *Janus*.

First and most importantly, the State Bar engages in core protected speech on matters of intense public concern. Using members' funds and claiming to represent their views, the State Bar has spoken and continues to speak on the practice of law, regulation of the legal profession, capital punishment, shielding suspected sex offenders, felon voting rights, diversity policies, the President's political speech, gun rights and regulation, immigration policies, and more. The State Bar's speech is no different from the speech recognized as core First Amendment speech in *Janus*. There, the Supreme Court concluded that the line drawn in *Abood* between chargeable and non-chargeable speech was unworkable because "the union speech at issue in this case is overwhelmingly of substantial public concern." *Janus*, 138 S. Ct. at 2477. It concluded that even the supposedly non-political subjects of collective bargaining were still matters of public concern because collective bargaining impacts the public fisc, and the more controversial speech from the unions—such as on climate change, sexual orientation and gender identity, and minority religions—were undoubtedly matters of profound public interest. *Id*. at 2476. The Wisconsin Bar's speech is identical with that latter category—indeed, it has spoken on some of the exact same issues—and this case presents even clearer matters of core public concern because, whereas the union in *Janus* could colorably claim that collective-bargaining speech is not "expressive" given its functional purpose of obtaining financial benefits for its members, the Wisconsin Bar does not engage in any speech that even arguably confers a direct financial or material benefit on Wisconsin attorneys. The Wisconsin Bar, in short, plainly utilizes its members' forced dues payments to express positions within First Amendment protection.

Second, that speech is funded by the dues of attorneys who are forced into its ranks as members, and this differs in no material respect from the agency-fee arrangement *Janus*

condemned. Much like the Wisconsin Supreme Court Rules & Operating Procedures, the labor law challenged in *Janus* enabled public employers and unions to agree to deduct payments from non-consenting employees' paychecks to fund union speech. 138 S. Ct. at 2460. The Supreme Court held that forcing compelled subsidization of private speech violates fundamental First Amendment rights. *Id.* The challenged action here—forcing the subsidization of speech by the State Bar—is no different. The State Bar forces members to pay an annual membership fee, including $129 for inactive members and $258 for full dues-paying members. Compl. ¶ 20. Indeed, under Wisconsin's scheme even *inactive* members are forced to fund the State Bar's speech. *Id.* And, just as the labor law *Janus* invalidated conditioned employment on payment of agency fees, Wisconsin conditions attorneys' livelihoods on the payment of bar dues.

Third, there is a close parallel between labor unions and integrated bar associations. *Keller* acknowledged as much. *See* 496 U.S. at 12 (concluding that there is "a substantial analogy between the relationship of the State Bar and its members, on the one hand, and the relationship of employee unions and their members, on the other."). This is because, like a union, a state bar is funded primarily from its members' funds; like a union, a state bar is restricted to a particular profession; and, like a union, a state bar purports to represent members' interest in their capacity as members of that profession. *See id.* at 11–13. *Keller* therefore rejected the view, expressed by the California Supreme Court in the case under review, that a state bar is a government agency for First Amendment purposes. The right analogy, *Keller* held, is with a labor union.[3] In articulating First Amendment principles applicable to labor unions, *Janus* also articulated the principles applicable to this case.

---

[3] Similarly, during oral argument in *Janus*, Justice Sotomayor observed that forcing dues payment from public employees represented by a labor union is "no different than forcing student…participati[on] in fees to provide a public forum [or] to have a bar association regulated. These are all forcing the subsidization of private interests for a government purpose." Tr. of Oral Arg. at 7.

Fourth, the line that *Janus* concluded is impossible to draw in the labor-union context between political and non-political speech is equally untenable in this context. *Keller*, after concluding that integrated bars are no different from labor unions for First Amendment purposes, attempted to distinguish between "ideological" and "non-ideological" speech, just as the Court had previously done in *Abood*—the case *Janus* overruled. From the start, *Abood* recognized that there would "be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." 431 U.S. at 236. *Keller* similarly recognized that:

> [p]recisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisers to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern.

496 U.S. at 15. *Janus* provided a simple response to both *Abood* and *Keller*: the line seems murky because it does not exist. All public-sector labor-union speech is core speech protected under the First Amendment because it all concerns matters of intense public concern—in particular, the operation of government. As shown above, that is equally true of the Wisconsin Bar's speech. *Abood*'s rules governing unions have been overruled; *Keller*'s rules governing state bars must be as well. The Seventh Circuit precedent that Defendants cite (at 9) in support of an integrated bar relies on *Abood*'s erroneous reasoning and pre-dated *Janus*'s return to standard First Amendment protection in this context too.

Fifth, *Keller* erred in failing to consider the possibility that *Abood* sold citizens' First Amendment rights short. Instead, it took *Abood* as a given and applied its principles as settled law. Though erroneous, this was understandable, since *Abood*'s vitality as constitutional law was not challenged in *Keller*. *See* 496 U.S. at 16–17. Quite the opposite, *Keller* addressed the far more aggressive proposition, which the California Supreme Court adopted, that *no* First

Amendment restrictions apply to state bars' ability to speak with funding from non-consenting members. The *Keller* Court therefore approached the problem from the other direction, considering whether to apply *Abood*'s restrictive First Amendment regime or *no* First Amendment principles at all. It did not consider the *third* possibility that *Janus* identified as the right answer: that no distinction between "ideological" and "non-ideological" speech is tenable and that compelled dues payments should be subject to heightened scrutiny.

This similarity between *Keller* and *Abood* is difficult to overstate. In *Knox v. Serv. Emps. Int'l Union, Local 1000*, which forecast *Janus*'s holding on agency-fee arrangements, the Court criticized *Abood* for articulating principles that were more the product of "historical accident" than sound legal reasoning. 567 U.S. 298, 312 (2012). *Keller* is no different. In fact, *Keller* piled historical accident on top of historical accident by (1) assuming *Abood*'s validity and so perpetuating one historical accident and (2) failing to meaningfully consider the possibility that compulsory bar dues in integrated-bar arrangements trigger enhanced scrutiny because that was, due to the posture of the case, not the focus of the litigation.

What's more, *Keller* also extended the superficial and antiquated reasoning of *Lathrop v. Donohue*, 367 U.S. 820 (1961), which upheld compelled dues payments to and membership in Wisconsin's integrated bar. But, like *Abood*, that case predated much of the Court's modern First Amendment jurisprudence and contained very little analysis. Instead, it cited an offhand statement in a labor case, *Railway Employment Dep't v. Hanson*, 351 U.S. 225, 238 (1956), that compelled financial support for unions is no more unconstitutional than a state law forcing a lawyer "to be a member of an integrated bar." *Lathrop*, 367 U.S. at 843 (quoting *Hanson*, 351 U.S. at 238). But, because *Janus* held that compelled financial support for unions *is* unconstitutional, *Lathrop* provides no better basis for *Keller*'s holding than does *Abood*. Like *Abood*, *Lathrop* unsoundly relies on an analogy between private compulsion and state compulsion that fails to appreciate that the state, unlike private employers, is subject to the First and Fourteenth Amendments. *See Janus*, 138 S. Ct. at 2463.

Sixth, *Janus* directly refutes any contention that the Wisconsin Bar mitigates or eliminates the mandatory-dues scheme's burden on First Amendment rights by allowing members a reduction for dues payments. *Janus* held that no agency fee is constitutional "unless the employee *affirmatively consents* to pay." 138 S. Ct. at 2486. That holding brought the agency-fee scheme into alignment with ordinary First Amendment principles. After all, no one would seriously contend that Wisconsin may pass a law diverting portions of its citizens' paychecks to a political party with the citizens' only having the ability to opt out of subsidizing portions, but not all, of the political party's speech—and then receiving only half a reduction in the compulsory subsidization. The same principle controls here.

Last, it bears noting that Defendants' response (at 8–10) to the core of Plaintiffs' claims is that "[t]he *Janus* majority did not overrule *Keller*." But Defendants hardly even attempt to defend the underlying reasoning of *Keller* as being consistent with broader First Amendment doctrine, and that is quite telling. Defendants' response to the merits of Plaintiffs' claims is that any challenges to the integrated bar "fail as a matter of law under *Keller* and its progeny." Plaintiffs agree, at least so far as lower-court review is concerned. But importantly, Defendants make no argument that *Keller* was correctly decided or that it coalesces with First Amendment principles. And *Janus* overturned the foundational precedent for *Keller* and its progeny.

### 2.     Compelled Membership Violates the First Amendment

If anything, Wisconsin's integrated-bar arrangement imposes a greater burden on First Amendment rights than the agency-fee arrangement *Janus* condemned because it imposes a mandatory duty to belong to the State Bar as a formal member, whereas the public-sector workers in *Janus* already had a recognized right *not* to join the union.

An integrated state bar is an expressive association like a church, fraternal organization, civic association, or advocacy group. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Allowing state-compelled membership in an expressive association is a striking constitutional anomaly because it has been clear for decades that forced union membership as a condition of public employment is unconstitutional, *Abood*, 431 U.S.

at 235, and it has been clear since at least *Elrod v. Burns*, 427 U.S. 347, 357 (1976), that *no* type of membership can be commanded as a condition of state-sanctioned livelihood. Wisconsin nevertheless persists in demanding that aspiring attorneys join the State Bar as members and thereby consent to its speech on their behalf. That is an independent First Amendment violation, apart from the compelled exaction of dues. Yet the Supreme Court, with scant reasoning, upheld such compelled membership in *Lathrop*. 367 U.S. at 843 (concluding that compelled dues payments as a component of membership in the state bar did not impinge the First Amendment right of free association).

There can be no serious doubt that the Wisconsin State Bar is an expressive association. It speaks on a wide range of matters subject to substantial public interest, including capital punishment, shielding suspected sex offenders, felon voting rights, diversity policies, the President's political speech, gun rights and regulation, immigration policies, and the practice of law and regulation of the practice of law—all subjects protected as core First Amendment speech. And, when it speaks on such subjects, it often takes *one* side—for example, when it advocates in support of legislation to modify the public laws or alter the operations of government—irrespective of the fact that some among its members may disagree. Consequently, the element that distinguishes a parade from a mere walk "to reach a destination" is present here: the purpose to "mak[e] some sort of collective point, not just to each other but to bystanders along the way." *Hurley*, 515 U.S. at 568. After all, the State Bar speaks loudly on some of the most hot-button issues of the day, which it does specifically to make a political point on behalf of a group—i.e., a collective point. The Bar can purport neither to afford a neutral environment where all manner of views of all members may be given equal voice nor to address only narrow and arcane topics unique to the legal profession.[4] The State Bar is plainly an expressive association, organized to bring people together to make *its* preferred collective point.

---

[4] Neither or both of these attributes would be sufficient to pass First Amendment muster. And if the Bar could claim to advocate only on a very narrow subset of "wholly outside the political process and to concern the internal affairs of the profession," it could claim precedential support from *Lathrop*, 367 U.S. at 834. *Janus* calls *Lathrop* into doubt for this untenable distinction

And that would be fine, except that Wisconsin law requires *all* attorneys to join—not only to fund the Bar's speech, but to call themselves members and suffer the Bar to speak for them. There is zero difference between that arrangement and mandatory membership in any other advocacy organization. And the violation of First Amendment principles is so plain that even *Abood* rejected that as a constitutionally permissible scenario. There, the Court wrote that "[o]ur decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments" and it was "[e]qually clear…that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment." 431 U.S. at 234. Likewise, the lead *Janus* dissenting opinion also recognized that a formal-membership requirement would violate the Constitution. *See Janus*, 138 S. Ct. at 2487–90 (Kagan, J., dissenting) (describing the proper "balance" as protecting citizens' rights not to join a labor union).

Yet it is actual membership in the State Bar that Wisconsin demands. This underscores further the errors of *Keller* and *Lathrop*. Although *Abood* recognized a unique harm from compelled membership—a harm elaborated in far greater detail in more recent associational rights case law—*Lathrop* inexplicably treated the dignitary harm of forced association as having no independent meaning apart from compelled funding (which it concluded, from *Hansen*, is constitutional). The Court concluded that, because a bar member "is free to attend or not attend [the bar's] meetings or vote in its elections," it was "confronted…only with a question of compelled financial support of group activities, not with involuntary membership in any other aspect." 367 U.S. at 828. It is hard to imagine a ruling more at odds with subsequent precedent, which treats the "freedom not to associate" as a constitutional right independent of any financial obligation. *Jaycees*, 468 U.S. at 623.

---

between "political" and "internal" professional concerns. After all, when the Bar speaks, it is typically speaking about *the law* that governs the public.

Rather than re-assess *Lathrop*'s reasoning in light of its more recent expressive-association precedent, *Keller* repeated its error—this time with zero reasoning. *Keller* did not distinguish between "membership" and "dues," but rather lumped them together without any explanation. *See* 496 U.S. at 5 (describing the arrangement ultimately upheld as one requiring "membership and dues").[5] So *Keller* did not stop at repeating *Abood*'s errors; it also extended them to reach a conclusion *Abood* itself disclaimed. *Keller* and *Lathrop* should be revisited and overruled.

### B. Wisconsin's Compulsory Dues and Membership Requirements Fail Any Potentially Applicable Standard of Review

Because Wisconsin's integrated bar scheme imposes a substantial burden on First Amendment rights—by both mandating dues and forcing membership itself—it must be subject to constitutional scrutiny. Whether that level is "strict" or "exacting" scrutiny remains unclear because *Janus* expressly left the question open. *See Janus*, 138 S. Ct. at 2465. It did so because the agency-fee arrangement it addressed would fail either test. So too does Wisconsin's integrated bar scheme.

Although the result would be the same under either standard, Supreme Court precedent indicates that strict scrutiny should apply. Like Illinois's unconstitutional agency-fee scheme, Wisconsin's statutory scheme for the State Bar similarly constitutes "the compelled subsidization of private speech," which "seriously impinges on First Amendment rights." *Id.* at 2464. A statute compelling the subsidization of private speech is not analogous to a commercial-speech regulation. *See Harris v. Quinn*, 134 S. Ct. 2618, 2639 (2014) ("[I]t is apparent that the speech compelled in this case is not commercial speech."). It is, rather, a content-based restriction because a statutory scheme that selects a certain speaker and then requires members of a profession to financially support and associate with that speaker necessarily restricts the content of the speech, allowing the speaker to exercise government-granted

---

[5] In *Keller*, the question whether an integrated bar may use "its name to advance political and ideological causes or beliefs" was raised (and not decided), 496 U.S. at 17, but that is different from the question of forced membership.

discretion over the message. That is not materially different from a statutory codification of favored and disfavored speech—it is, in effect, appointing a speech arbiter. Such compelled subsidies and compelled membership also amount to compelled speech. Under either view, strict scrutiny is the appropriate level of review for that inherently suspect arrangement, and strict scrutiny requires proof of a "compelling necessity" and a statutory arrangement that is "precisely tailored." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988).

In any event, the integrated-bar arrangement fails any applicable level of scrutiny. Under exacting scrutiny, government compulsion "must 'serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Janus*, 138 S. Ct. at 2465 (quoting *Knox*, 567 U.S. at 310). As noted, Wisconsin's statutory scheme compelling licensed attorneys to join and fund the State Bar is materially indistinguishable from Illinois's statutory scheme compelling public employees to fund labor unions. And the principal justification offered to support agency-fee arrangements—the interest of "labor peace"—is obviously inapplicable in this context.

The possible justifications here fare no better.[6] *Keller* recognized only two possible justifications for an integrated bar that the Wisconsin Bar purports to advance[7]: (1) improving the quality of legal services and (2) regulating the legal profession. *Keller*, 496 U.S. at 13. Both purported interests fail to justify the burdens on speech and associational rights.

**Quality of Legal Services.** The first interest fails because it is not a compelling governmental interest. A state may legitimately seek to advance almost any particular public

---

[6] To be clear, it is the Defendants' burden to prove that the challenged government action satisfies constitutional scrutiny. *See, e.g.*, *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989).

[7] *See* SCR 10.01(2) (providing the Wisconsin supreme court "shall" organize the State Bar and define its members' rights "to the end that the [State Bar] shall promote the public interest by maintaining high standards of conduct in the legal profession and by aiding in the efficient administration of justice."); SCR 10.02(2) (describing the purpose of the state bar to include "development and improvement of means to deliver legal services to the people of Wisconsin"); SCR 10.03(5)(b)(1) (requiring (ostensibly) compulsory dues only be used for activities "related to the purposes of regulating the legal profession or improving the quality of legal services").

interest—kindness and compassion among its citizens, the provision of services to the poor, economic growth, etc.—but simply naming such an interest does not suffice to justify impingement of First Amendment rights. The Supreme Court's jurisprudence recognizes that the First Amendment does *not* permit government to "substitute its judgment as to how best to speak for that of speakers and listeners" or to "sacrifice speech for efficiency." *Riley*, 487 U.S. at 791, 795; *cf. United States v. Stevens*, 130 S. Ct. 1577, 1585–86 (2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits."). That is the general rule, fully applicable here.

At best, an asserted interest in improving the quality of legal services is merely another way of articulating the "free rider" argument *Janus* rejected—i.e., that labor unions' bargaining efforts benefit an entire unit and forced funding of that effort prevents unit employees from benefiting from those efforts without paying their fair share. And the "free rider" argument is even weaker in this context. The assumption behind an interest in "improving the quality of legal services" is, by the same token, that improvement of the profession benefits all attorneys and should be funded by all attorneys. *See Keller*, 496 U.S. at 8 (quoting *Lathrop*, 367 U.S. at 842–43, for the proposition that "the costs of improving the profession…should be shared by the subjects and beneficiaries of the regulatory program…."). But "free-rider arguments are generally insufficient to overcome First Amendment objections." *Janus*, 138 S. Ct. at 2466 (quoting *Knox*, 567 U.S. at 311) (edit marks omitted). As *Janus* observed:

> To hold otherwise across the board would have startling consequences. Many private groups speak out with the objective of obtaining government action that will have the effect of benefiting nonmembers. May all those who are thought to benefit from such efforts be compelled to subsidize this speech?
>
> Suppose that a particular group lobbies or speaks out on behalf of what it thinks are the needs of senior citizens or veterans or physicians, to take just a few examples. Could the government require that all seniors, veterans, or doctors pay for that service

> even if they object? It has never been thought that this is permissible.

*Id.* Yet that appears to be all the improvement-of-the-profession argument means: that the State Bar lobbies or speaks for the purpose of advancing the interests of the legal profession and it believes lawyers should pay their fair share for that speech. The argument fares even worse here than in *Janus*, where it was rejected. There is no compelling interest in compelling lawyers to pay for the State Bar's speech expressing its view of what is and is not good for the profession or for the public.[8]

Finally, even if that interest were considered compelling in some respect, forcing attorneys to join the bar and subsidize its speech is not tailored to achieve it, because that same end could be achieved through means significantly less restrictive of associational freedoms. It is not apparent, to say the least, what compulsory membership in an advocacy organization has to do with improving the quality of legal services. As for subsidies, the state could fund any program that it believes necessary to improve the quality of legal services out of tax revenues, in the same way that it seeks to advance almost every other interest. Given the state's power to tax and spend, it has no need to impinge attorneys' First Amendment rights.

**Regulating the Legal Profession**. The second interest, in regulating the legal profession, is not compelling for the same reason as the "quality of legal services" rationale: the government's convenience in carrying out its functions is no basis to impinge core First Amendment rights. *See Riley*, *supra*.

In any instance, the government's regulatory interest (as well as its interest in improving the quality of legal services) does not justify the integrated-bar regime because Wisconsin does not need an integrated bar to regulate lawyers. Compelled speech and association are permissible only when they "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465. It is

---

[8] On the other hand, if "improving the legal profession" refers to the Bar's efforts to hold attorneys to high ethical standards under its regulatory power, then the interest is redundant with the asserted interest in regulating the legal profession, addressed below.

therefore dispositive that at least 18 states do *not* have integrated bars and therefore do not wed the bar's regulatory and expressive activities. *In re Petition for a Rule Change to Create a Voluntary State Bar of Nebraska*, 841 N.W.2d 167, 171 (Neb. 2013) (listing the following states as having non-integrated bars: Arkansas, Colorado, Connecticut, Delaware, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New York, Ohio, Pennsylvania, Tennessee, and Vermont). That 18 states regulate the legal profession without an integrated bar demonstrates that significantly less restrictive means exist for accomplishing that interest.

Equally unavailing is the argument that an integrated bar is necessary for funding the activities of a state bar. First, the State of Wisconsin has the power to tax, which generally impinges no First Amendment right. And second, this argument is circular: there is only a compelling interest in funding the activities of the bar if those activities justify burdens on First Amendment rights. Certainly, the Republican Party or the Rotary might view compulsory funding by state coercion as helpful to fund its activities, but that is, of course, irrelevant to whether those activities justify the First Amendment burden of compulsory dues. *See Janus* at 2485–86 (rejecting the argument that termination of agency fees "may cause unions to experience unpleasant transition costs in the short term and may require unions to make adjustments in order to attract and retain members").

A related argument is that integrated bars are more effective at raising funds than voluntary bar associations. But *any* organization—the ACLU, the Libertarian Party, the Mennonite Church, and everyone else—could plausibly claim that donations would increase if membership were mandatory, and no one could seriously contend that the government would have a compelling interest in forcing membership. *See Janus*, at 2486 (referring to compulsory fees to labor unions as a "windfall" that "cannot be allowed to continue indefinitely").

Finally, if it were not obvious enough that the role of regulating lawyers could be delegated to a state agency that does not engage in extensive, often entirely irrelevant, advocacy, it bears emphasizing that, in Wisconsin, the State Bar does *not* in fact hold ultimate

responsibility for regulating lawyers: that prerogative is vested in the Wisconsin Supreme Court and its Office of Lawyer Regulation ("OLR"). SCR 21.01(1) (providing components of the lawyer regulation system); SCR 21.02 (providing the OLR "responds to [attorney-related]…grievances…and, when appropriate, investigates allegations of attorney misconduct"); SCR 21.09 ("The supreme court determines attorney misconduct and medical incapacity and imposes discipline or directs other action in attorney misconduct and medical incapacity proceedings filed with the court."); *see also* Supreme Court Offices: Office of Lawyer Regulation, Wisconsin Court System (OLR "is an agency of the Wisconsin Supreme Court. OLR receives grievances relating to lawyer misconduct, conducts investigations, and prosecutes violations of lawyer ethics rules."). It is plain that there are less restrictive means than an integrated bar to achieve those functions that may actually amount to a compelling state interest when the Bar itself is not principally responsible for vindicating that interest. There are any number of ways, short of compelled speech and expressive association, that the State of Wisconsin could regulate lawyers without forcing speech and expressive association. The arrangement therefore fails any level heightened scrutiny.

## II.  Response to Defendants' Other Arguments

The other grounds for dismissal urged by the Defendants lack merit and should be rejected, except as to dismissal of the State Bar as a Party and dismissal of the Plaintiffs' refund claim.

First, Defendants' arguments against "an as-applied First Amendment challenge to 45 activities of the State Bar," Def's Br. 10, are lodged against a claim not present in this case. Plaintiffs have challenged the requirement that they make *any* "financial contributions in support of the State Bar." Compl. ¶ 62. The relevance of the illustrative 45 activities of the Bar referenced in the Complaint is to demonstrate that the Bar engages in speech and expressive association on matters of core public concern and that it is an inherently political organization. Those things are relevant here for the same reason they were relevant in *Janus. See* 138 S. Ct. at 2476–77. Defendants' arguments that the Complaint does not state a claim against

45 specific expenditures under *Keller* are therefore misplaced for the simple reason that Plaintiffs bring no such challenge. They challenge the entire *Keller* regime, in the same way that the *Janus* litigation challenged the entire *Abood* regime, rather than the charging of particular union expenses to non-members.

Second, Defendants' arguments (at 16–17) under the statute of limitations, the Bar audit system, and standing doctrine (22–24) are all irrelevant for the same reason. They assume Plaintiffs have brought a challenge to specific expenditures when the Complaint challenges all expenditures and the entire *Keller* regime. Evidence that Plaintiff Jarchow has made (and continues to make) payments under that regime in the absence of his affirmative consent proves that he *does* have standing for a facial challenge, not that he lacks it. Defendants concede this. Def's Br. 25 (stating that the standing argument against Plaintiff Jarchow applies only "to the extent [the Complaint] states an as-applied challenge").

Third, after reviewing Defendants' briefing, Plaintiffs agree that the State Bar should be dismissed as a party, as its sovereign-immunity defense appears to be meritorious and Plaintiffs may obtain relief through their official capacity claims against the officials of the Bar under the doctrine of *Ex Parte Young* and under 42 U.S.C. § 1983. Similarly, after reviewing Defendants' briefing, Plaintiffs agree that the requested relief of a refund should be dismissed as well.

By contrast, the Board of Governors should not be dismissed. The Board exercises authority over "the affairs and activities of the association," SCR 10.05(4), and therefore its members clearly fit within the doctrine of *Ex Parte Young*. The Seventh Circuit held in *Lee v. Bd. of Regents of State Colleges*, 441 F.2d 1257, 1260 (7th Cir. 1971), that a suit against an analogous state board of trustees for a Wisconsin university system could proceed under the doctrine of *Ex Parte Young* and did not treat the body as an instrumentality of the state. To be sure, a subsequent decision of the Seventh Circuit, *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 403 (7th Cir. 2018), appears to be in conflict with *Lee*, holding that the suit should only proceed against individual members of a board of trustees of an Illinois university system,

not against the board itself. But, under Seventh Circuit precedent, the earlier decision controls over the later in the event of a conflict. *See Brooks v. Walls*, 279 F.3d 518, 523 (7th Cir. 2002); *Robledo-Gonzales v. Ashcroft*, 342 F.3d 667, 680 n.10 (7th Cir. 2003); *Caine v. Burge*, 897 F. Supp. 2d 714, 719 (N.D. Ill. 2012) ("[W]here a newer case of the Seventh Circuit states a potentially contrary rule to the rule articulated in a prior precedent the court is bound to follow the prior precedent where the newer case neither recognized the prior rule nor was circulated to the full court as required by Circuit Rule 40(e)" (cleaned up)). The Court therefore should follow *Lee* and conclude that the Board is a proper party.

Fourth, because Plaintiffs now disclaim their request for a refund and because they never sought a refund from the Bar's officers in their individual capacity—the Complaint (at ¶¶ 6–11) expressly states that they are sued solely in their official capacities—Defendants' qualified-immunity argument is moot and irrelevant.

Finally, Defendants Kastner, Ohiku, and Swanson—the President-Elect, Immediate Past-President, and the Chairperson of the Board of Governors—are proper Defendants in this matter. An official is not immune from suit when his "power by virtue of his office sufficiently connect[s] him with the duty of enforcement to make him a proper party to a suit." *Ex parte Young*, 209 U.S. at 161. Defendants Kastner, Ohiku, and Swanson are all officers of the State Bar. *See* SCR 10.04(1) ("The officers of the state bar include a president, a president-elect, an immediate past-president, a chairperson of the board of governors, a secretary and a treasurer."). And each of these officers sits on the executive committee of the State Bar. *See* SCR 10.06 ("The executive committee consists of the president, the president-elect, the immediate past-president, the chairperson of the board of governors [and others]"). As officers of the State Bar and members of the executive committee, Defendants Kastner, Ohiku, and Swanson are all sufficiently connected with the duties required to enforce the integrated bar to be proper Defendants in their official capacities. *See* SCR 10.06 (2) (explaining the powers and duties of the executive committee). Along with their specific statutorily delegated duties, these officers of the Bar and members of the executive committee are required to "perform

such other duties as the board of governors may prescribe." SCR 10.06. As such, these officers may also be required to exercise any duty relevant to the existence of the Bar, which is another reason that they are proper Defendants in this suit. In *Thiel*, the Seventh Circuit recognized that claims against the individual officials of the State Bar must be allowed to proceed, and that decision is binding on this Court. *Thiel*, 94 F.3d at 403 ("[T]he plaintiffs' claim against the individual defendants for prospective injunctive relief could proceed"). Thus, the claims against these officers must be allowed to proceed.

## CONCLUSION

Plaintiffs are entitled to relief under the First Amendment, but this Court is powerless to afford them relief in the face of contrary Supreme Court precedent. Accordingly, the Court should decide Defendants' motion to dismiss so that Plaintiffs may seek relief in a forum that is not bound under *Agostini* to follow *Keller* and *Lathrop*.

Dated: June 11, 2019

Respectfully submitted,

/s/ Andrew M. Grossman

DAVID B. RIVKIN, JR.
ANDREW M. GROSSMAN
RICHARD B. RAILE
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1697 (phone)
(202) 861-1783 (fax)

RICHARD M. ESENBERG
WI Bar No. 1005622
WISCONSIN INSTITUTE FOR LAW &
LIBERTY
1139 East Knapp Street
Milwaukee, WI 53202-2828
(414) 727-9455 (phone)
(414) 727-6385 (fax)
rick@will-law.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2019, the foregoing was filed using the Court's CM/ECF system. All counsel of record will be served through the Court's CM/ECF system.

Dated: June 11, 2019

/s/ Andrew M. Grossman

ANDREW M. GROSSMAN
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1697 (phone)
(202) 861-1783 (fax)

*Attorney for Plaintiffs*